# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **REBA REDMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:13CV171 ACL** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of Defendant's final decision

denying the application of Reba Redman for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security Income under Title XVI of the Act.   This case has

been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice

Reform Act and is being heard by consent of the parties.   See 28 U.S.C. § 636(c).   Plaintiff filed

a Brief in support of the Complaint.   (Doc. 19.)   Defendant filed a Brief in Support of the

Answer.   (Doc. 26.)

## Procedural History

On December 16, 2008, Plaintiff filed applications for Disability Insurance Benefits and

Supplemental Security Income, claiming that she became unable to work due to her disabling

condition on May 1, 2007.   (Tr. 74-75.)   Plaintiff's claims were denied initially and, following an

administrative hearing, her claims were denied in a written opinion by an Administrative Law

Judge (ALJ), dated September 3, 2010.   (Tr. 79-91.)   Plaintiff then filed a request for review of

the ALJ's decision with the Appeals Council of the Social Security Administration (SSA).   (Tr.

145.)   On November 16, 2011, the Appeals Council remanded the case to a different ALJ for

resolution of several issues. (Tr. 98-100.) The Appeals Council directed the ALJ to take the following action upon remand: consider information regarding Plaintiff's work activity; evaluate medical evidence regarding Plaintiff's bilateral carpal tunnel syndrome; evaluate Plaintiff's mental impairments in accordance with the relevant regulations; re-evaluate Plaintiff's residual functional capacity ("RFC") based on the treating source opinions and obtain further evidence if needed; and obtain vocational expert testimony. (Id.)

After an additional administrative hearing, a second ALJ denied Plaintiff's claims in a written opinion dated July 19, 2013. (Tr. 11-21.) On September 25, 2013, the Appeals Council denied Petitioner's request for review. (Tr. 1-5.) Thus, the decision of the second ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's second administrative hearing was held on June 18, 2013. (Tr. 49.) Plaintiff was present and was represented by counsel. (Id.) Also present was vocational expert Janice Hastert and witness Terri Burchette. (Id.)

The ALJ examined Plaintiff, who testified that she was fifty-one years of age; five-feet, four inches tall; and weighed 204 pounds. (Tr. 51.) Plaintiff stated that she has an Associate's Degree. (Id.) Plaintiff testified that she was married and has no children under the age of eighteen. (Tr. 51-52.)

Plaintiff testified that her attendant drove her to the hearing. (Tr. 52.) Plaintiff stated that she only drives short distances, because she becomes nervous when she drives far. (Id.)

Plaintiff testified that she last worked in May of 2008. (Id.)

Plaintiff's attorney examined Plaintiff, who testified that Dr. Curtis Horstman was her primary care doctor, and Dr. Charles Morgan was her hematologist. (Tr. 53.) Plaintiff stated that Dr. Morgan checks her blood periodically, and that she had last seen him in February of 2013. (Tr. 54.)

Plaintiff testified that she has problems with her back, left leg, and right hand. (Id.) Plaintiff stated that her left leg and back problems are related. (Id.) Plaintiff testified that no doctor has recommended back surgery. (Id.) Plaintiff stated her back starts hurting when she has been sitting for a while, and that her leg goes numb. (Tr. 55.) Plaintiff testified that her left leg also goes numb when she stands for long periods. (Id.)

Plaintiff stated that she has carpal tunnel syndrome in her right hand. (Id.) Plaintiff testified that a neurologist in Springfield diagnosed her with carpal tunnel syndrome. (Id.) Plaintiff stated that her neurologist has not recommended any kind of treatment to her hand or wrist. (Id.)

Plaintiff testified that she also has mental impairments, for which she receives treatment at Behavioral Health Care. (Id.) Plaintiff stated that she sees Dr. Jennifer Long and Yang Lu. (Id.) Plaintiff testified that she has been diagnosed with anxiety disorder and bipolar disorder. (Tr. 56.) Plaintiff stated that her mental impairment is her biggest problem. (Id.) Plaintiff testified that she is nervous a lot, she paces, and her hands shake. (Id.) Plaintiff stated that when she has an "episode," she screams, yells, and cries a lot, and is unable to focus. (Id.) Plaintiff testified that these episodes occur once or twice a week and last from a couple hours to all day. (Id.)

Plaintiff testified that she is not good about being around strangers. (Tr. 57.) Plaintiff stated that she becomes extremely nervous when she is around strangers. (Id.) Plaintiff testified

that her concentration is "not very good."   (Id.)

Plaintiff testified that she is unable to perform her past work, because she cannot lift anything due to back pain and carpal tunnel syndrome.   (Id.)   Plaintiff stated that she also has difficulty being around people in general, and she becomes really nervous when she is around authority figures.   (Id.)   Plaintiff testified that she would be unable to remain in the work place when she has a crying spell.   (Id.)

Plaintiff testified that Terri Burchette is her in-home tech, and helps her with "chores and stuff."   (Tr. 57-58.)   Plaintiff stated that she is unable to perform these tasks herself, because of the physical activity required and she has difficulty concentrating and remembering.   (Tr. 58.) Plaintiff testified that she has a nurse come to her home weekly to set up her medications.   (Id.)

The ALJ re-examined Plaintiff, who testified that she does "very little" housework.   (Id.) Plaintiff stated that she "sometimes" cooks, does not do laundry, and does not do any yard work. (Tr. 59.)   Plaintiff testified that she recently started attending church.   (Id.)   Plaintiff stated that she shops for groceries with her daughter.   (Id.)   Plaintiff testified that her grandchildren visit her and stay overnight.   (Id.)

Plaintiff testified that she worked full-time until she was laid off in 2007.   (Id.)   Plaintiff stated that all of her problems started in 2010.   (Tr. 60.)

Plaintiff's attorney next examined Terri Burchette, who testified that she was an in-home tech and that she had been providing services to Plaintiff for approximately one year.   (Tr. 61.) Ms. Burchette stated that Plaintiff had received services from another tech prior to this time.   (Id.) Ms. Burchette testified that she goes to Plaintiff's home Monday through Friday for approximately two hours.   (Id.)   Ms. Burchette stated that she helps Plaintiff with home needs and personal care. (Id.)   Ms. Burchette testified that her company provides services to clients through the State of

Missouri.  (Id.)  Ms. Burchette stated that she assists Plaintiff with showering, dressing, performing household chores, and cooking.  (Tr. 62.)

Ms. Burchette testified that she has observed Plaintiff experience difficulty focusing on a task and completing tasks.  (Id.)  Ms. Burchette stated that Plaintiff has to be reminded to take her medications.  (Id.)

Ms. Burchette testified that Plaintiff has frequent crying spells.  (Tr. 63.)  Ms. Burchette stated that the crying spells occur every one to two weeks and can last most of the day.  (Id.)

Ms. Burchette testified that a nurse comes to Plaintiff's home once a week to set up her medications.  (Tr. 64.)

The ALJ questioned Ms. Burchette, who testified that Plaintiff tries to help her with chores as much as she can.  (Id.)  Ms. Burchette stated that Plaintiff is limited in her ability to stand for long periods to cook.  (Id.)

The ALJ next examined the vocational expert, Janice Hastert.  The ALJ asked Ms. Hastert to assume a hypothetical claimant with Plaintiff's background and the following limitations: occasionally lift twenty pounds and frequently lift ten pounds; walk or stand six hours out of an eight-hour workday; sit for six hours; occasionally climb stairs; never climb ropes, scaffolds or ladders; occasionally balance, stoop, crouch, kneel and crawl; limited to jobs that do not require constant, rapid repetitive hand movements; only occasional overhead reaching and handling with the right upper extremity; avoid prolonged exposures to extreme cold temperatures, humidity, wetness, chemicals, dust, fumes, and noxious odors; avoid unprotected heights and hazardous, moving machinery; can perform simple tasks, but is limited to jobs that do not demand attention to details or complicated instructions or job tasks; may work in proximity to others, but is limited to jobs that do not require close cooperation, interaction with co-workers and would work better in

relative isolation; limited to only occasional interaction and cooperation with the general public; retains the ability to maintain attention and concentration for two-hour periods at a time; and is able to adapt to change in a work place on a basic level and accept supervision on a basic level. (Tr. 67.)   Ms. Hastert testified that the individual would be unable to perform Plaintiff's past work.   (Id.)   Ms. Hastert stated that the individual could perform the following light, unskilled jobs: garment sorter (75,000 positions nationally, 1,100 in Missouri); collator (145,000 positions nationally, 3,000 in Missouri); and inserting machine operator (75,500 positions nationally, 1,500 in Missouri).   (Tr. 68.)

The ALJ next asked Ms. Hastert to assume the following limitations: occasionally lift ten pounds and frequently lift ten pounds; walk or stand two hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; and can occasionally feel, handle and finger.   (Id.)   Ms. Hastert testified that the individual would be unable to perform Plaintiff's past work.   (Id.)   Ms. Hastert stated that the individual would be unable to perform any work if she had the same nonexertional limitations as the first hypothetical.   (Tr. 69.)

The ALJ asked Ms. Hastert to add the following limitation to the first hypothetical: unable to perform simple, routine, repetitive tasks; unable to cooperate and interact with co-workers or the general public; unable to maintain attention and concentration; unable to adapt to changes; and unable to accept supervision or maintain acceptable levels of punctuality and attendance.   (Id.)   Ms. Hastert testified that the individual would be unable to perform any jobs.   (Id.)

Plaintiff's attorney next examined Ms. Hastert.   Plaintiff's attorney instructed Ms. Hastert to use the following definition of 'marked'--"a severe, noticeable impairment that significantly and noticeably precludes performance."   (Tr. 70-71.)   Plaintiff's attorney asked Ms. Hastert to assume marked limitations in the following areas: ability to complete a normal workday and work

week without interruptions from psychologically-based symptoms; and the ability to perform at a consistent pace and without an unreasonable number and length of rest periods. (Tr. 71.) Ms. Hastert testified that the individual would be unable to perform any work. (Id.) Ms. Hastert further testified that an individual with marked limitations in either the ability to 1) maintain attention and concentration for extended periods or work in coordination or proximity to others without being distracted, or 2) respond appropriately to supervision, co-workers and usual work situations, would be incapable of performing any work. (Tr. 71-72.)

## B.     Relevant Medical Records

Plaintiff presented to Ozarks Medical Center on May 17, 2007, with acute neurological symptoms, including speech and disequilibrium, and pain and numbness in the right arm. (Tr. 425.) Hammad Qadir, M.D. diagnosed Plaintiff with transient ischemic attack,[1] likely secondary to subtherapeutic international normalized ratio ("INR").[2] (Tr. 426.) Dr. Qadir increased Plaintiff's dosage of Coumadin.[3] (Id.)

Plaintiff returned to Ozarks Medical Center on May 23, 2007, at which time she reported that she had difficulty with her speech the day after she was discharged from the hospital. (Tr. 396.) Plaintiff indicated that she was admitted to the hospital after falling against the wall while working. (Id.) Plaintiff also complained of heaviness in her chest. (Tr. 397.) Clara Applegate, M.D., diagnosed Plaintiff with transient episode of word searching; with a differential

---

[1]A sudden focal loss of neurologic function with complete recovery usually within 24 hours; caused by a brief period of inadequate perfusion in a portion of the territory of the carotid or vertebral basilar arteries. Stedman's Medical Dictionary, 181 (28th Ed. 2006).
[2]INR is a measure of the extrinsic pathway of coagulation. See Stedman's at 1641.
[3]Coumadin is indicated for the prophylaxis and treatment of thromboembolic complications associated with cardiac valve replacement. See Physician's Desk Reference ("PDR"), 2666 (67th Ed. 2013).

diagnosis of transient ischemic attack with possibility of stress related incident.   (Tr. 398.)

Plaintiff reported that she had been exhausted and under a lot of stress at work.   (Id.)   Plaintiff

underwent an MRI of the brain, which revealed abnormalities consistent with small vessel disease.

(Tr. 415.)

Plaintiff presented to Behavioral Health Care on June 19, 2007, upon the referral of Dr.

Applegate, with complaints of anxiety.   (Tr. 392.)   Plaintiff reported that she had experienced

anxiety since she was a child.   (Id.)   Upon mental status examination, Plaintiff was agitated, her

speech was pressured, she had flight of ideas, her insight and judgment were impaired, she had

poor memory and concentration, and her mood was depressed.   (Tr. 393-94.)   Bill Dugan,

LCSW, diagnosed Plaintiff with adjustment disorder with depressed mood; and a GAF[4] score of

50 to 60,[5] with the highest GAF score in the past year of 60 to 65.[6]   (Tr. 394.)   Mr. Dugan stated

that Plaintiff had been struggling with marital issues, which were foremost on her mind.   (Id.)

Plaintiff saw Dr. Applegate on July 31, 2007, at which time Plaintiff was anxious.   (Tr.

401.)   Plaintiff reported marriage difficulties and a fear of being alone.   (Id.)   Plaintiff also

complained of pain in her forearm, knees, feet, elbows, left shoulder, low back, and headaches.

_____

[4]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."   Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[5]A GAF score of 41 to 50 indicates "serious symptoms" or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."   DSM-IV at 32.   A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."   Id.

[6]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."   Id.

(Tr. 401-02.)   Dr. Applegate stated that Plaintiff has anxiety disorder that is partly based upon fears of being alone and the conflict in her marriage.   (Tr. 402.)   Dr. Applegate indicated that she reviewed Plaintiff's "normal nerve conduction studies" with Plaintiff.   (Id.)   Dr. Applegate prescribed Topamax[7] and Celebrex,[8] and recommended an MRI of the lumbosacral spine.   (Id.)

Plaintiff underwent an MRI of the lumbar spine on August 8, 2007, which revealed mild degenerative disk disease at L4-5 with mild height loss, desiccation and very subtle diffuse posterior disk bulge at all levels; yet no evidence of nerve root impingement.   (Tr. 443.)

Plaintiff underwent an echocardiogram on July 11, 2008, due to complaints of chest pain, which revealed normal LV size and ejection fraction of sixty percent; mild concentric left ventricular hypertrophy; biatrial enlargement; mild mitral and tricuspid regurgitation; and thickened aortic and tricuspid valve.   (Tr. 449.)

Plaintiff saw hematologist Charles Morgan, M.D., on August 5, 2008, for anticoagulation management.   (Tr. 607.)   Dr. Morgan indicated that Plaintiff has a history of mitral stenosis,[9] and that she had undergone open heart surgery with placement of a St. Jude's mitral valve replacement along with tricuspid valve repair in June of 2003.   (Id.)   Plaintiff had remained anticoagulated with Coumadin ever since that surgery, yet her anticoagulation management had been complicated by the fact that she had been very resistant to the Coumadin.   (Id.)   Dr. Morgan also assessed anxiety/depression, and chronic pain.   (Tr. 608.)   Dr. Morgan continued Plaintiff on Coumadin. (Id.)

Plaintiff saw Dr. Morgan on November 6, 2008, for anticoagulation management, at which

---

[7]Topamax is indicated for the treatment of seizures.   See WebMD, http://www.webmd.com/drugs (last visited February 13, 2015).
[8]Celebrex is a non-steroidal anti-inflammatory drug indicated for the treatment of osteoarthritis. See PDR at 2263.
[9]Pathologic narrowing of the orifice of the mitral valve.   Stedman's at 1832.

time she reported she was doing relatively well.  (Tr. 605-06.)  Plaintiff's asthma was well controlled.  (Tr. 606.)

On February 23, 2009, Dr. Morgan stated that Plaintiff's management had been difficult and that Plaintiff was not consistent about coming in for monitoring.  (Tr. 609.)  Plaintiff complained of episodes of shortness of breath, dizziness, feeling that she is going to pass out, and incoherence.  (Id.)

Plaintiff underwent a sleep study on March 19, 2009, which revealed moderate obstructive sleep apnea syndrome.  (Tr. 521.)

Plaintiff saw Ling Li, M.D. on March 26, 2009, for a neurology consult.  (Tr. 601-02.) Plaintiff reported dizzy spells occurring for the past six months, during which she occasionally loses consciousness.  (Tr. 601.)  No abnormalities were noted on physical examination.  (Id.) Dr. Li diagnosed Plaintiff with multiple episodes of dizziness, near syncope, or syncope; and noted that depression and anxiety could be a potential cause of her symptoms as well.  (Id.)  Dr. Li prescribed Topamax and recommended additional testing.  (Id.)

On March 28, 2009, Plaintiff saw Jonathan D. Rosenboom, Psy.D., clinical psychologist, for a consultative examination at the request of the state agency.  (Tr. 526-30.)  Plaintiff reported experiencing crying spells since her health issues began in 2007.  (Tr. 526.)  Plaintiff also complained of depressed mood, lost pleasure in activities, and irritability.  (Tr. 527.)  Plaintiff indicated that she was laid off from her last position in December 2008.  (Tr. 528.)  She denied her psychological symptoms ever affected her ability to work.  (Id.)  Plaintiff reported that she tries to keep busy during the day and she looks for work, but she has to be "choosy," because she is unable to sit for long periods.  (Id.)  Upon examination, Plaintiff's mood was slightly dysphoric, she was attentive and cooperative, she was occasionally tearful when discussing her multiple

medical problems, she often spoke about thoughts of hopelessness, her delayed auditory memory was slightly impaired, and she displayed signs of anxiety.   (Tr. 529.)   Dr. Rosenboom diagnosed Plaintiff with dysthymic disorder,[10] severe; and a GAF score of 55.   (Tr. 530.)   Dr. Rosenboom expressed the opinion that plaintiff's ability to understand, remember, and carry out instructions is moderately impaired, but not precluded, by her mental disorder; her ability to respond appropriately to work supervisors, co-workers and work stressors is moderately impaired; and she does possess the capacity to manage her finances.   (Id.)

Plaintiff underwent imaging of her chest on March 31, 2009, which revealed no active cardiopulmonary disease; left ventricular enlargement; and mild scoliosis in the lower thoracic spine.   (Tr. 823.)

On April 3, 2009, Plaintiff underwent nerve conduction studies, which revealed mild bilateral median neuropathy at the wrist.   (Tr. 600.)

On April 13, 2009, state agency psychologist Mark Altomari, Ph.D., completed a Psychiatric Review Technique.   (Tr. 531-42.)   Dr. Altomari found that Plaintiff's dysthymic disorder and anxiety caused mild limitations in her activities of daily living; ability to maintain social functioning; and ability to maintain concentration, persistence, or pace.   (Tr. 539.)

Dr. Altomari also completed a Mental Residual Functional Capacity Assessment, in which he expressed the opinion that Plaintiff was moderately limited in the following abilities: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and

---

[10]A chronic disturbance of mood characterized by mild depression or loss of interest in usual activities.   Stedman's at 569.

respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 543-44.)

Plaintiff presented to Kurt G. Zimmer, D.O., on April 15, 2009, to establish care. (Tr. 671.) Plaintiff complained of low back pain, shoulder pain, and depression. (Id.) Upon examination, Dr. Zimmer noted abnormalities of the lumbosacral spine, painful range of motion of the left shoulder, and dysthymic mood. (Tr. 672.) Dr. Zimmer diagnosed Plaintiff with shoulder joint pain, mitral valve disorder, lumbago,[11] and dysthymic disorder. (Id.) He prescribed Norco,[12] and Cymbalta.13 (Id.)

On June 5, 2009, Plaintiff saw a nurse practitioner at Dr. Zimmer's office with complaints of left knee pain and right wrist pain. (Tr. 666.) Upon physical examination, the nurse practitioner noted that right wrist pain was elicited by motion, but no erythema/warmth or weakness was observed. (Tr. 667.) Plaintiff was diagnosed with wrist joint pain, knee joint pain, and pain in the lower extremities. (Id.)

Plaintiff saw Dr. Zimmer on June 11, 2009, for follow-up regarding her knee pain. (Tr. 575.) Plaintiff requested that Dr. Zimmer complete a form for her attorney. (Id.) Dr. Zimmer indicated that Plaintiff had undergone x-rays of the left knee and an ultrasound of the left leg, which were negative. (Id.) Upon examination, Dr. Zimmer noted ligament laxity of the left knee, and mild edema of the left knee. (Id.) Dr. Zimmer diagnosed Plaintiff with knee joint

---

[11]Pain in the mid and lower back; a descriptive term not specifying cause. Stedman's at 1121.
[12]Norco is a combination of a narcotic pain reliever (hydrocodone) and a non-narcotic pain reliever (acetaminophen) indicated for the relief of moderate to severe pain. See WebMD, http://www.webmd.com/drugs (last visited February 13, 2015).
[13]Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety disorder. See PDR at 1323.

pain, lumbar spondylosis,[14] spondylolisthesis,[15] and carpal tunnel syndrome.   (Tr. 576.)

Dr. Zimmer completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) on June 11, 2009.   (Tr. 571-74.)   Dr. Zimmer expressed the opinion that Plaintiff could occasionally lift or carry twenty pounds, and frequently lift or carry ten pounds; stand or walk at least two hours in an eight-hour workday; must periodically alternate sitting and standing to relieve pain; is limited in her ability to push and pull in both her upper and lower extremities; can never climb, balance, or crawl; can occasionally kneel, crouch, and stoop; can occasionally handle, figure, and feel; and should avoid humidity/wetness and hazards.   (Id.)

Plaintiff saw Dr. Zimmer for follow-up on November 5, 2009, at which time she reported she had an appointment with a psychiatrist due to worsening depression.   (Tr. 657.)   Plaintiff also complained of left shoulder pain, back pain, and knee pain.   (Id.)   Dr. Zimmer diagnosed her with lumbar spondylosis and continued her medications.   (Tr. 657-58.)   Plaintiff continued to complain of low back pain and knee pain on December 9, 2009.   (Tr. 651.)   Dr. Zimmer continued Plaintiff's medications.   (Tr. 652.)

Plaintiff saw Stacy A. Bray, Psy.D., on December 17, 2009, for a scheduled appointment. (Tr. 786-87.)   Plaintiff reported the following symptoms: visual hallucinations of "faces," problems with trust, speaking in tongues, problems controlling spending and paying bills, problems concentrating, and multiple stressors.   (Tr. 786.)   Plaintiff presented with suicidal ideation, but denied having a plan of action or intent to act.   (Id.)   Upon examination, Plaintiff's mood was depressed and her affect was tearful.   (Id.)   Dr. Bray diagnosed Plaintiff with bipolar

---

[14]Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature.   Stedman's at 1813.
[15]Forward movement of the body of one of the lower lumbar vertebra below it, or on the sacrum. Stedman's at 1813.

disorder per records; and assessed a GAF score of 45-55.  (Id.)  Dr. Bray recommended

continued supportive therapy.  (Id.)

Plaintiff saw Dr. Bray on January 6, 2010, at which time her mood was depressed and her

affect was tearful.  (Tr. 788.)  Plaintiff was tearful about a heated argument with her husband.

(Id.)  Dr. Bray assessed a GAF score of 45-50.  (Id.)  On February 3, 2010, Plaintiff's mood was

somewhat better and her affect was more expressive.  (Tr. 790.)

Plaintiff saw Dr. Zimmer on February 4, 2010, with complaints of back pain, left hip pain,

and left knee pain.  (Tr. 646.)  Dr. Zimmer diagnosed Plaintiff with localized primary

osteoarthritis of the left hip.  (Tr. 647.)

Plaintiff saw Dr. Bray on February 24, 2010, at which time her mood was improved and

her affect was congruent with her mood.  (Tr. 792.)  Plaintiff's thoughts continued to be

rambling, but she was better connected at this session.  (Id.)  On March 17, 2010, Plaintiff's

mood was depressed and her affect was intense.  (Tr. 794.)  Plaintiff reported that her visual

hallucinations were more frequent and that they were always of people she knew who had died.

(Id.)  The hallucinations were more frequent when the tension with her husband was high.  (Id.)

Dr. Bray assessed a GAF score of 45-50.  (Id.)

Diedra T. Hayman, Ph.D.,[16] completed a Medical Source Statement-Mental on March 21,

2010, in which she expressed the opinion that Plaintiff was *markedly limited* in the following

areas:   ability to remember locations and work-like procedures; ability to understand and

remember very short and simple instructions; ability to understand and remember detailed

---

[16]Although Dr. Hayman's name is printed at the top of this form as the author, Plaintiff contends
that Dr. Imone actually completed the form, based on the signature at the end of the form.  (Tr.
577-79.)  For the sake of clarity, the undersigned will refer to this statement as that of Dr.
Hayman's.

instructions; ability to carry out very short and simple instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to work in coordination with or in proximity to others without being distracted by them; ability to make simple work-related decisions; ability to complete a normal workday and work-week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; ability to respond appropriately to changes in the work setting; ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently of others. (Tr. 578-79.) Dr. Hayman found that Plaintiff was *moderately limited* in the following areas: ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; and the ability to accept instructions and respond appropriately to criticism from supervisors. (Id.) Dr. Hayman also indicated that Plaintiff was unable to understand, remember, and carry out simple instructions; make judgments that are commensurate with the functions of unskilled work; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting. (Tr. 579.)

Plaintiff saw Robb E. Imone, D.O., for psychotherapy on March 26, 2010, at which time Plaintiff was extremely anxious and upset after having an argument with her husband. (Tr. 796.) Dr. Imone diagnosed Plaintiff with major depression, recurrent, severe; and a GAF score of 45. (Tr. 797.) Dr. Imone recommended that Plaintiff participate in therapy with her husband; and

prescribed Seroquel.[17]   (Id.)

Dr. Imone completed a Mental Residual Functional Capacity Questionnaire on March 26, 2010.   (Tr. 580-86.)   Dr. Imone indicated that Plaintiff had a current GAF score of 45, and that the highest GAF score she had had the past year was also 45.   (Tr. 580.)   Dr. Imone expressed the opinion that Plaintiff had extreme limitations in her ability to carry out detailed instructions, and the ability to interact appropriately with the general public.   (Tr. 583-84.)   Dr. Imone found that Plaintiff had *marked limitations* in the following areas: ability to remember locations and work-like procedures; ability to understand and remember very short and simple instructions; ability to understand and remember detailed instructions; ability to carry out very short and simple instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to complete a normal work-day and work-week without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; ability to ask simple questions or request assistance; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibit behavioral extremes; ability to respond appropriately to changes in the work setting; ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places or use public transportation; ability to set realistic goals or make plans independently of others; and the ability to tolerate normal levels of stress. (Tr. 583-85.)   Dr. Imone found that Plaintiff has *moderate limitations* in her ability to work in

---

[17]Seroquel is indicated for the treatment of schizophrenia and bipolar disorder.   See WebMD, http://www.webmd.com/drugs (last visited February 13, 2015).

coordination with or proximity to others without being distracted by them; and the ability to make simple work-related decisions. (Tr. 584.) Dr. Imone indicated that Plaintiff has *mild limitations* in her ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Id.) Dr. Imone found that Plaintiff was likely to be absent from work as a result of her impairments more than four days a month. (Tr. 585.) Finally, Dr. Imone indicated that Plaintiff had a history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. (Tr. 585-86.)

Plaintiff saw Dr. Bray on April 7, 2010, at which time she was depressed and her affect was congruent with her mood. (Tr. 800.) Plaintiff reported that the Seroquel had helped. (Tr. 801.) Dr. Bray assessed a GAF score of 45-50. (Id.)

Plaintiff saw a nurse practitioner at Dr. Imone's office on April 16, 2010, at which time she reported she was doing a little better. (Tr. 803.) Ms. Imone stated that Plaintiff showed some improvement. (Tr. 804.) She continued the Seroquel, and increased Plaintiff's dosage of Cymbalta. (Id.)

Plaintiff saw Dr. Bray on April 26, 2010, at which time her mood was normal and her affect was congruent with her mood. (Tr. 805.) Plaintiff reported that her thoughts become unfocused when she is emotionally overwhelmed with stress or anger. (Tr. 806.) Dr. Bray assessed a GAF score of 45-50. (Id.) Plaintiff's mood and affect were normal at her next session on May 13, 2010. (Tr. 808.) Dr. Bray assessed a GAF score of 45-55. (Tr. 809.) On June 16, 2010, Plaintiff's mood was expansive and her affect was congruent with her mood. (Tr. 814.) Dr. Bray noted that Plaintiff presented quite differently, with better thoughts, assertive, and powered [sic]. (Tr. 815.)

Plaintiff saw Su Min Ko, M.D., on June 18, 2010, with complaints of low back pain. (Tr.

839-43.)   Plaintiff described her pain as moderate and indicated it interferes only with some daily activities.   (Tr. 839.)   Upon examination, Dr. Ko noted tenderness of the cervical and lumbar spine.   (Tr. 841.)   Dr. Ko diagnosed Plaintiff with lumbar discogenic pain, lumbar facet arthropathy, degenerative disc disease, and spondylosis.   (Id.)

On August 11, 2010, Plaintiff reported that she was staying busy to help manage her anxiety and her mood, and that her relationship with her husband had improved.   (Tr. 1073.)   Dr. Bray stated that Plaintiff seemed to be making good progress, and assessed a GAF score of 50. (Id.)   On November 11, 2010, Plaintiff's mood was upset, hurt, and angry.   (Tr. 1077.)   Her thinking was tangential.   (Id.)   Dr. Bray assessed a GAF score of 40-50.   (Id.)

Plaintiff underwent a pulmonary function test on January 4, 2011, which revealed moderate restrictive ventilatory defect.   (Tr. 975.)

Plaintiff saw Curtis Horstman, D.O. on January 12, 2011, with complaints of symptoms of dyspnea at rest and on exertion, wheezing, and non-productive cough.   (Tr. 1049.)   Dr. Horstman diagnosed Plaintiff with moderate chronic obstructive pulmonary disease ("COPD").[18]   (Tr. 1050.)   Plaintiff presented for follow-up on January 24, 2011, at which time Dr. Horstman prescribed inhalers.   (Tr. 1048.)

On January 19, 2011, Plaintiff's mood was upset and her affect was mildly labile.   (Tr. 1081.)   Plaintiff reported distractible, tangential thinking; confusion; night time hallucinations, which increase when she is upset; crying spells; and withdrawal from others.   (Id.)   Dr. Bray assessed a GAF score of 40-50.   (Id.)   On February 14, 2011, Plaintiff's affect was bland and she kept her head down, maintaining poor eye contact.   (Tr. 1085.)   Plaintiff reported problems in her

---

[18]General term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied.   Stedman's at 554.

relationship with her husband.   (Id.)

Plaintiff presented to Dr. Horstman on February 25, 2011, with complaints of lower back pain, spasm, and stiffness.   (Tr. 1045.)   Plaintiff also reported pain that radiates to the lower leg and foot, and numbness in the arm and leg.   (Id.)   Upon examination, Dr. Horstman noted no swelling, edema or erythema, normal sensation, and normal coordination and reflexes.   (Tr. 1046.)   Dr. Horstman diagnosed Plaintiff with back pain with radiation.   (Id.)

On March 17, 2011, Plaintiff's mood was anxious and her affect was blunt.   (Tr. 1087.) Plaintiff had anxiety about her health and problems with her husband.   (Id.)   Dr. Bray assessed a GAF score of 50.   (Tr. 1088.)

Plaintiff saw Dr. Imone on March 28, 2011, at which time she reported experiencing periods of time during which she is really anxious and upset, has trouble thinking, and has thought content and processing difficulties.   (Tr. 1089.)   Dr. Imone stated that it sounds as if Plaintiff has some psychotic symptoms with some paranoid thinking.   (Id.)   He started Plaintiff on Haldol.[19] (Id.)

Plaintiff saw Dr. Bray on March 31, 2011.   (Tr. 1091.)   Plaintiff's mood was sad and her affect was tearful.   (Tr. 1091.)   Plaintiff reported relationship problems.   (Id.)   Dr. Bray stated that Plaintiff's mental health symptoms appeared stable.   (Id.)   She assessed a GAF score of 55-60.   (Id.)

On April 8, 2011, Plaintiff complained of continued lower back pain.   (Tr. 1041.)   Dr. Horstman prescribed Norco.   (Tr. 1042.)

Plaintiff presented to Richard Tompson, M.D. on April 12, 2011, with complaints of low

_____

[19]Haldol is indicated for the treatment of schizophrenia and schizoaffective disorders.   See WebMD, http://www.webmd.com/drugs (last visited February 13, 2015).

back pain. (Tr. 968.) Dr. Tompson increased Plaintiff's dosage of Norco. (Id.)

Plaintiff was admitted at Ozarks Medical Center from April 19, 2011 through April 21, 2011, after presenting to the emergency room with depression and suicidal thoughts. (Tr. 946.) Plaintiff was stabilized and was prescribed Abilify[20] on discharge. (Tr. 947.)

Plaintiff underwent an MRI of the lumbar spine on April 27, 2011, which revealed an L5-S1 disc desiccation and mild disc bulge encroaching upon the neural foramina and possibly touching the exiting L5 nerve roots without evidence of impingement; and a mild disc bulge at L4-5 without significant stenosis or impingement. (Tr. 964.)

Plaintiff saw Dr. Bray on May 3, 2011. (Tr. 1093.) Her mood was dysphoric. (Id.) Plaintiff reported cognitive confusion, decrease in auditory hallucinations, visual hallucinations only at bedtime, and relationship problems. (Id.) Plaintiff had filed for divorce. (Id.) Dr. Bray assessed a GAF score of 45. (Id.)

Plaintiff saw Dr. Tompson for follow-up regarding lower back pain on May 17, 2011, at which time he continued Plaintiff's medications. (Tr. 959.)

Plaintiff saw Dr. Horstman on June 13, 2011, with complaints of difficulty sleeping. (Tr. 1032.) Dr. Horstman diagnosed Plaintiff with sleep apnea and prescribed nasal decongestants. (Tr. 1034.)

Plaintiff presented to Dr. Horstman on July 26, 2011, with complaints of dyspnea on exertion, wheezing, and non-productive cough. (Tr. 1026.) Dr. Horstman diagnosed Plaintiff with moderate COPD. (Tr. 1028.)

Plaintiff saw Dr. Bray on August 29, 2011, at which time she was depressed. (Tr. 1099.)

---

[20]Abilify is an antipsychotic drug indicated for the treatment of schizophrenia and bipolar I disorder. See PDR at 2631.

Plaintiff reported that she was separated from her husband and upset about this. (Id.) Dr. Bray assessed a GAF score of 40. (Id.) On December 8, 2011, Plaintiff's affect was "bland." (Tr. 1103.) Plaintiff's thoughts were scattered and she was unable to identify her emotions. (Id.) Dr. Bray assessed a GAF score of 50. (Id.)

Anne E. Winkler, M.D., answered interrogatories on January 15, 2012, in which she expressed the opinion that Plaintiff has the following limitations: lift or carry twenty pounds occasionally, and ten pounds frequently; stand or walk for six hours out of an eight-hour workday; no sitting limitation; occasional postural activities, except that she can never climb ladders, ropes, or scaffolds; can only frequently reach overhead on the right; can finger/feel for two hours at a time and for six hours a day as of April 2009; no concentrated exposure to cold, humidity, wetness, dust, fumes, odors and gases; and no exposure to unprotected heights. (Tr. 1124.) Dr. Winkler noted that there was some concern regarding Plaintiff's narcotic use, as she was fired from her pain clinic. (Tr. 1123.)

Evelyn Adamo, Ph.D., answered interrogatories on January 17, 2012, in which she expressed the opinion that Plaintiff had *mild limitations* in activities of daily living; moderate limitations in social functioning; *moderate limitations* in concentration, persistence, or pace; and no episodes of decompensation. (Tr. 1108.)

On February 9, 2012, Plaintiff's mood was dysphoric. (Tr. 1151.) She reported visual hallucinations occurring two times a week. (Id.) Plaintiff indicated that she was trying to work it out with her husband. (Id.) Dr. Bray assessed a GAF score of 40. (Id.) Dr. Bray stated that Plaintiff's symptoms are somewhat stable. (Id.) On March 15, 2012, Plaintiff's mood was dysphoric, but her thoughts were more connected than usual. (Tr. 1155.) Plaintiff reported continued difficulty with organization in her daily life and keeping track of her bills. (Id.) Dr.

Bray informed Plaintiff that she was leaving the clinic, and Plaintiff requested to transfer her care to Dr. Long. (Id.)

Plaintiff saw Robert Milton, M.D. at Behavioral Health Care on March 19, 2012, at which time Dr. Milton stated Plaintiff was stable on her medications. (Tr. 1157.) On April 23, 2012, Plaintiff was anxious, because she was contemplating moving for her husband's job. (Tr. 1159.) On May 3, 2012, Plaintiff was much more stable, although she was still stressed over the upcoming move to Poplar Bluff. (Tr. 1161.) On May 31, 2012, Plaintiff was not as anxious, because she was no longer moving as a result of her husband losing his job. (Tr. 1163.) Dr. Milton stated that Plaintiff was stable on medications overall. (Id.) On June 28, 2012, Plaintiff was anxious, but better than she had been in the past few months. (Tr. 1165.)

Plaintiff saw Dr. Jennifer Long at Behavioral Health Care on October 2, 2012, at which time Plaintiff's mood was anxious. (Tr. 1169.) Dr. Long noted a moderate decline in Plaintiff's condition. (Id.) On October 4, 2012, Plaintiff was upset, because she had been terminated from her pain management clinic the previous day since her urine drug screen was positive for methamphetamine. (Tr. 1167.) On November 20, 2012, Plaintiff's mood was anxious. (Tr. 1173.) Dr. Long again noted a moderate decline, and assessed a GAF score of 51. (Id.) On December 5, 2012, Plaintiff's mood was sullen. (Tr. 1175.) Plaintiff's primary concern was relationship problems with her husband. (Id.) Dr. Long noted a slight symptom improvement, and assessed a GAF score of 55. (Id.) On January 8, 2013, Plaintiff's mood was depressed, and Dr. Long assessed a GAF score of 51, noting a moderate decline. (Tr. 1177.) Plaintiff's mood was anxious on February 20, 2013. (Tr. 1183.) Dr. Long assessed a GAF score of 55. (Id.) On March 20, 2013, Plaintiff's mood was within normal limits, and she reported things were "good at home." (Tr. 1185.) Dr. Long assessed a GAF score of 57. (Id.) On April 3, 2013,

Plaintiff's mood was positive, and she reported that "things were good," and her relationship was going well. (Tr. 1187.) Dr. Long assessed a GAF score of 60. (Id.)

Plaintiff saw Yang Lu, LMSW, at Behavioral Health Care May 23, 2013, at which time Plaintiff reported nightmares that were preventing her from sleeping. (Tr. 1191.) Ms. Lu found that Plaintiff's mood was stable. (Tr. 1192.) Ms. Lu assessed a GAF score of 50. (Id.)

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 20, 2010.

2.      The claimant has not engaged in substantial gainful activity since May 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: mild degenerative disc disease, mild carpal tunnel syndrome, obesity, moderate chronic obstructive pulmonary disease, mitral valve replacement with normal cardiac function, bi-polar disorder, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift and carry 20 pounds occasionally and 10 pounds frequently. She can walk or stand for 6 of 8 hours in a work day. She can sit for 6 of 8 hours in a work day. She may occasionally climb stairs, but never ropes, scaffolds or ladders. She can occasionally balance, stoop, crouch, kneel or crawl. She is limited to jobs that do not require constant rapid, repetitive hand movements. She is limited to occasional overhead reaching and handling with her right upper extremity. She must avoid prolonged exposure to cold temperatures, humidity, wetness, chemicals, dusts, fumes/noxious odors. She must avoid unprotected heights and hazardous moving machinery. She may do simple tasks but is limited to jobs that do not demand attention to details or complicated job tasks or instructions. She may work in proximity to others, but, is limited to jobs that do not require close cooperation and interaction with co-workers, in that, she would work best in relative isolation. She is limited to

occasional interaction and cooperation with the general public.   She can maintain
attention and concentration for minimum 2 hour periods at a time.   She can adapt
to changes in the workplace on a basic level and accept supervision on a basic level.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and
        416.965).

7.      The claimant was born on May 23, 1962 and was 44 years old, which is defined as
        a younger individual age 18-49, on the alleged disability onset date.   The claimant
        subsequently changed age category to closely approaching advanced age (20 CFR
        404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in
        English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability
        because using the Medical-Vocational Rules as a framework supports a finding that
        the claimant is "not disabled," whether or not the claimant has transferable job
        skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the national
        economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969,
        and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act,
        from May 1, 2007, through the date of this decision (20 CFR 404.1520(g) and
        416.920(g)).

(Tr. 13-21.)

The ALJ's final decision reads as follows:

        Based on the application for a period of disability and disability insurance benefits
        filed on December 16, 2008, the claimant is not disabled under sections 216(i) and
        223(d) of the Social Security Act.

        Based on the application for supplemental security income filed on December 16,
        2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social
        Security Act.

(Tr. 21.)

24

**Discussion**

**A.**     **Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.   See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).   The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.   See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).   Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.   See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).   If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.   See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.   See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).   "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."   Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).   The analysis required has been described as a "searching inquiry."   Id.

**B.**     **Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).   The claimant has the burden of proving that s/he has a disabling impairment.   See Ingram v. Chater, 107 F.3d 598, 601

(8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.   See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).   First, it is determined whether the claimant is currently engaged in "substantial gainful employment."   If the claimant is, disability benefits must be denied.   See 20 C.F.R. §§ 404.1520, 416.920(b).   Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.   See 20 C.F.R §§ 404.1520(c), 416.920(c).   To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."   Id.   Age, education and work experience of a claimant are not considered in making the "severity" determination.   See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.   See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   The listed impairments are found in Appendix One to 20 C.F.R. 404.   20 C.F.R. pt. 404, subpt. P, App. 1.   If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.   See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.   See 20 C.F.R. § 404.1520 (e), 416.920 (e).   If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.   See id. If the claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).   The claimant is entitled to disability benefits only if s/he is not able to perform any other work.   See id.   Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.   See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).   The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work:   activities of daily living, social functioning, concentration, and persistence or pace.   See 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3).   Functional loss is rated on a scale that ranges from no limitation to a level of severity, which is incompatible with the ability to perform work-related activities.   See id.   Next, the Commissioner must determine the severity of the impairment based on those ratings.   See 20 C.F.R. §§ 404.1520a(c), 416.920a(c).   If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.   See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing

the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a(c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff argues that the ALJ erred in determining Plaintiff's RFC. Specifically, Plaintiff contends that, in formulating Plaintiff's RFC, the ALJ relied on the opinions of non-examining doctors while dismissing the opinions of treating sources.

The ALJ made the following determination with regard to Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift and carry 20 pounds occasionally and 10 pounds frequently. She can walk or stand for 6 of 8 hours in a work day. She can sit for 6 of 8 hours in a work day. She may occasionally climb stairs, but never ropes, scaffolds or ladders. She can occasionally balance, stoop, crouch, kneel or crawl. She is limited to jobs that do not require constant rapid, repetitive hand movements. She is limited to occasional overhead reaching and handling with her right upper extremity. She must avoid prolonged exposure to cold temperatures, humidity, wetness, chemicals, dusts, fumes/noxious odors. She must avoid unprotected heights and hazardous moving machinery. She may do simple tasks but is limited to jobs that do not demand attention to details or complicated job tasks or instructions. She may work in proximity to others, but, is limited to jobs that do not require close cooperation and interaction with co-workers, in that, she would work best in relative isolation. She is limited to occasional interaction and cooperation with the general public. She can maintain attention and concentration for minimum 2 hour periods at a time. She can adapt to changes in the workplace on a basic level and accept supervision on a basic level.

(Tr. 15.)

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).

Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.   See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).   Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.   See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).   An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.   See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources.   See 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).   The Regulations require that more weight be given to the opinions of treating physicians than other sources.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).   A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).   See also Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004).   This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Plaintiff first argues that the ALJ erred in weighing the medical opinions of Drs. Winkler and Zimmer. Plaintiff contends that the ALJ failed to incorporate all of the manipulative limitations found by Drs. Winkler and Zimmer arising from Plaintiff's carpal tunnel syndrome.

Dr. Zimmer began treating Plaintiff in April 2009 for her various complaints. (Tr. 671.) On June 5, 2009, Plaintiff complained of right wrist pain. (Tr. 666.) A nurse practitioner diagnosed Plaintiff with right wrist pain. (Tr. 667.) Plaintiff also reported hand symptoms on June 11, 2009, the date Dr. Zimmer completed his medical source statement. (Tr. 575.) Dr. Zimmer diagnosed Plaintiff with carpal tunnel syndrome at that time. (Tr. 576.)

The ALJ found that Plaintiff's "mild carpal tunnel syndrome" was a severe impairment. (Tr. 13.) The ALJ acknowledged that Dr. Zimmer completed a medical source statement in June 2009, in which he found that Plaintiff could occasionally handle, finger, and feel due to bilateral carpal tunnel syndrome. (Tr. 19, 573.) The ALJ stated that he assigned "some weight" to Dr. Zimmer's opinion, but that the manipulative limitations were not supported by the mild carpal tunnel syndrome that has been documented. (Tr. 19.)

Dr. Winkler, a non-examining independent medical expert, provided an opinion regarding Plaintiff's functional limitations in answers to interrogatories dated January 15, 2012. (Tr. 19, 1124.) Dr. Winkler expressed the opinion that Plaintiff could frequently lift overhead on the right; and could finger/feel for two hours at a time and for six hours a day as of April 2009. (Tr. 1124.) Dr. Winkler noted that Plaintiff's medical records established a diagnosis of "mild bilateral carpal tunnel syndrome." (Tr. 1120.) The ALJ indicated that he was assigning "significant weight" to Dr. Winkler's opinion, although he was further reducing Plaintiff's RFC to allow for subjective complaints. (Tr. 19.)

Although the ALJ did not specifically address Dr. Winkler's finding regarding Plaintiff's manipulative limitations, his failure to do so was not reversible error. Immediately prior to discussing Dr. Winkler's opinion, the ALJ found that Plaintiff's "mild carpal tunnel syndrome" did not justify the manipulative limitations found by Dr. Zimmer. (Tr. 19.) The ALJ, therefore, implicitly found that the manipulative limitations found by Dr. Winkler were also not justified by Plaintiff's mild carpal tunnel syndrome.

The ALJ's determination that Plaintiff's carpal tunnel syndrome was mild and did not result in significant limitations is supported by the objective medical evidence. As noted by the ALJ, nerve conduction studies Plaintiff underwent on July 31, 2007, were normal. (Tr. 401.) In April 2009, nerve conduction studies revealed "mild bilateral median neuropathy at the wrist." (Tr. 600.) Plaintiff had only seen Dr. Zimmer on two occasions when he provided his opinion in June 2009. Dr. Zimmer diagnosed Plaintiff with carpal tunnel syndrome on the same date he rendered his opinion. (Tr. 576.) Plaintiff testified at the administrative hearing that no doctor has recommended surgery or any other treatment for her carpal tunnel syndrome. (Tr. 55.)

Due to Plaintiff's mild carpal tunnel syndrome, the ALJ limited Plaintiff to jobs that do not

require constant rapid, repetitive hand movements; and occasional overhead reaching and handling with her right upper extremity.   (Tr. 15.)   The ALJ did not err in assessing Plaintiff's RFC based on the whole record.   It is the ALJ's responsibility to determine the claimant's RFC based on all the medical evidence.   See Lauer, 245 F.3d at 704.   The ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians."   Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (quoting Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007)).   The ALJ also complied with the remand order, which simply directed the second ALJ to evaluate medical evidence regarding Plaintiff's bilateral carpal tunnel syndrome where the first ALJ omitted any discussion of Plaintiff's carpal tunnel syndrome despite diagnoses of such in the record.   (Tr. 98-100.)

With regard to Plaintiff's mental RFC, Plaintiff contends that the ALJ erred in assigning significant weight to the opinions of consultative psychologist Dr. Rosenboom, state agency psychologist Dr. Altomari, and medical expert Dr. Adamo; and discounting the opinion of treating physician Dr. Imone.   Plaintiff first argues that none of these sources addressed the length of time Plaintiff is able to maintain attention and concentration, and the ALJ failed to explain how he arrived at his conclusion that Plaintiff was able to do so for two hours at a time.   Plaintiff relies on George v. Astrue, 4:10CV2136RWS(NAB), 2012 WL 1032973 (E.D. Mo. March 6, 2012), an unpublished decision from this district.

Plaintiff's argument that the ALJ erred by failing to cite to evidence to support his finding that Plaintiff was able to maintain attention and concentration for two hours at a time is unavailing. In George, the United States Magistrate Judge recommended remand, because the ALJ had not explained what weight he gave to the state agency consultant's opinion.   2012 WL 1032973 at * 13.   The court found that, because the case was already being remanded, the ALJ should also

reassess the claimant's RFC. Id. at *14. Thus, Plaintiff's reliance on George is misplaced.

In this case, the ALJ's finding that Plaintiff was able to maintain attention and concentration for two hours at a time is supported by substantial evidence. The ALJ indicated that he was assigning significant weight to the opinion of consultative psychologist Dr. Rosenboom. (Tr. 18.) Dr. Rosenboom examined Plaintiff on March 28, 2009, at which time he noted Plaintiff was attentive, and assessed a GAF score of 55. (Tr. 529.) Dr. Rosenboom expressed the opinion that Plaintiff's ability to understand, remember, and carry out instructions is moderately impaired, but not precluded, by her mental disorder. (Tr. 530.) Dr. Rosenboom's opinion is consistent with his findings on examination, and with the ALJ's finding that Plaintiff is able to maintain attention and concentration for two hour segments.

The ALJ next stated that he was similarly assigning significant weight to the Mental Residual Functional Capacity Assessment completed by Dr. Altomari on April 13, 2009, as it was in keeping with the medical evidence. (Tr. 18.) Dr. Altomari expressed the opinion, based on a review of the record, that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods. (Tr. 543.) Dr. Altomari stated that Plaintiff was able to carry out simple work instruction; and maintain adequate attendance and sustain an ordinary routine without special supervision. (Tr. 545.) Dr. Altomari's opinion is, therefore, consistent with the ALJ's finding.

The ALJ also assigned significant weight to the opinion of non-examining medical expert Dr. Adamo. (Tr. 18.) Dr. Adamo answered interrogatories on January 17, 2012, in which she indicated that Plaintiff had diagnoses of bipolar disorder and anxiety disorder, with GAF scores of 50 to 60. (Tr. 1107-08.) Dr. Adamo expressed the opinion that Plaintiff had mild limitations in activities of daily living; moderate limitations in social functioning; and moderate limitations in

concentration, persistence, or pace. (Tr. 1108.) Dr. Adamo noted that Plaintiff was compliant with treatment and improved by November 2011. (Tr. 109.) The ALJ stated that he was assigning Dr. Adamo's opinion significant weight, because she is an independent expert with access to the entire medical record. (Tr. 18.) Dr. Adamo's opinion that Plaintiff has moderate limitations in concentration, persistence, or pace is consistent with the ALJ's mental RFC finding.

The ALJ indicated that he had considered the opinion of Dr. Imone, who had treated Plaintiff between June 2007 and March 2010, but found that it was not supported by the "ongoing medical records, the generally benign nature of the objective testing and functional examinations, documented herein." (Tr. 19.) Dr. Imone expressed the opinion that Plaintiff had extreme limitations in her ability to carry out detailed instructions and interact appropriately with the general public; and marked limitations in the ability to maintain attention and concentration for extended periods, among other areas. (Tr. 584.)

The ALJ properly discredited the opinion of Dr. Imone. Dr. Imone's own treatment notes do not document symptoms to support extreme or marked limitations as found in Dr. Imone's opinion. The ALJ accurately noted that, although Plaintiff has received ongoing treatment for her mental impairments, it generally relates to situational issues and family relationships. (Tr. 19.) On the date Dr. Imone completed his opinion, Plaintiff was extremely anxious and upset after having an argument with her husband. (Tr. 796.) Dr. Imone assessed a GAF score of 45, prescribed Seroquel, and recommended that Plaintiff participate in therapy with her husband. (Tr. 797.) Plaintiff's other mental health providers' records support the findings that Plaintiff's exacerbations in mental health symptoms were often precipitated by problems in the relationship with her husband. (Tr. 394, 401, 788, 794.) The ALJ also correctly found that Plaintiff has made good progress with treatment, as is evidenced by her increased GAF scores. (Tr. 19, 1175, 1183,

11851187.)

Thus, the ALJ properly discredited the opinion of Dr. Imone, because it was unsupported by the medical record, including Dr. Imone's own treatment notes. Although no provider specifically stated that Plaintiff was capable of maintaining attention and concentration for two hour segments, this conclusion is consistent with the opinions of Drs. Rosenboom, Altomari, and Adamo, all of whom found that Plaintiff was no more than moderately limited in her ability to maintain attention and concentration.

Plaintiff next contends that the ALJ failed to include any limitations regarding Plaintiff's ability to accept supervision. Plaintiff notes that Dr. Rosenboom found that Plaintiff's ability to respond appropriately to work supervisors, co-workers, and work stressors was moderately impaired, although not precluded by her mental impairments; and similarly, Dr. Altomari found that Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. Plaintiff argues that, despite assigning significant weight to the opinions of these providers, the ALJ did not explain why he failed to incorporate their findings regarding Plaintiff's ability to accept supervision.

Plaintiff's argument lacks merit. The ALJ included the following social limitations in his RFC determination: limited to jobs that do not require close cooperation and interaction with co-workers, in that she would work best in relative isolation; limited to occasional interaction and cooperation with the general public; and can adapt to changes in the workplace on a basic level and accept supervision on a basic level. (Tr. 15.) The ALJ, therefore, incorporated the findings of Drs. Rosenboom and Altomari in limiting Plaintiff to working in relative isolation and to accepting supervision on a basic level only. Neither provider found that Plaintiff was incapable of accepting supervision. In fact, Dr. Altomari stated that Plaintiff "can interact adequately with

peers and supervisors." (Tr. 545.)

The ALJ also properly evaluated the credibility of Plaintiff's subjective complaints of pain and limitations in determining Plaintiff's RFC. An ALJ may discredit a claimant's subjective allegations of disabling symptoms to the extent they are inconsistent with the overall record as a whole, including: the objective medical evidence and medical opinion evidence; the claimant's daily activities; the duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medications and medical treatment; and the claimant's self-imposed restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529; SSR 96-7p.

The ALJ cited the following factors in discrediting Plaintiff's subjective complaints of pain and limitations: (1) the medical evidence reveals minimal objective findings on testing and examination; (2) Plaintiff's mental health treatment generally relates to situational issues; (3) Plaintiff was fired from her pain clinic due to her narcotic usage; (4) Plaintiff engaged in significant daily activities, including attending church, visiting with friends and relatives, shopping, and driving; (4) Plaintiff was able to work at substantial gainful activity levels until she was laid off; and (5) Plaintiff did not quit work secondary to her alleged disability. (Tr. 19.)

In sum, the ALJ's RFC determination is supported by substantial evidence on the record as a whole. The ALJ properly weighed the medical opinion evidence as discussed above. The ALJ's determination is supported by the medical evidence of record. The ALJ also performed a proper credibility analysis and found Plaintiff's subjective allegations of disabling limitations were not credible. A vocational expert testified that a claimant with the RFC found by the ALJ was capable of performing other work existing in significant numbers in the national economy. (Tr. 68.) Thus, substantial evidence supports the ALJ's decision finding Plaintiff not disabled.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of March, 2015.